BOUTALL, Judge.
This appeal arises from a suit for reduction of purchase price and liquidated damages on an agreement to repair a residence. From a judgment in favor of the sellers-builders, the purchasers have taken this appeal.
Mr. and Mrs. Brown purchased a year-old residence from Louis J. Hotard and Dewey Johnson for $82,000.00 on October 1, 1979. The house was a prefabricated building, manufactured by Kingsberry Homes, and was erected and finished as a joint venture by Hotard and Johnson, building contractors. The Browns moved into the house two months prior to the act of sale and discovered a number of defects, major and minor, during that period. In order to show their good intentions to correct the problems complained of by the Browns, Hotard and Johnson entered into a written agreement with the purchasers, dated September 28, 1979, providing that repairs to the roof would be completed by April 1, 1980 and that all other “punch list” items would be corrected by December 1,1979. The sellers deposited $7,000.00 into escrow with their attorneys, to be forfeited to Mr. and Mrs. Brown in the event the sellers failed to make the repairs within the above time limits. The agreement further provided a one year warranty on materials and workmanship from date of act of sale plus a five year factory warranty on major components of the air conditioning-heating system. On November 13, 1980, the Browns, feeling that the work had not been done to their satisfaction, filed suit, asking for a reduction in price of $15,000.00, damages for mental anguish and inconvenience in the amount of $10,000.00, and attorney’s fees of $5,000.00 plus the $7,000.00 stipulated in the agreement of September 28, 1979. Trial was held before a judge on December 1 and 2, 1981. The trial judge determined that the plaintiffs failed to carry their burden of proof and found in favor of Hotard and Johnson, dismissing the plaintiffs’ suit. This appeal followed.
The issues before this court are: whether the sellers breached the agreement to repair and should forfeit the $7,000.00 escrow money; whether the court erred in inquiring as to the sufficiency of the amount in escrow to remedy the defects; and whether the court should have awarded the plaintiffs the amount their experts estimated as the cost of repairing or replacing the defects.
We consider together the first two issues raised by the plaintiffs, regarding the agreement to repair and the $7,000.00 escrow fund, and find them to have no merit.
*507 To begin with, the plaintiffs failed to follow the terms of their own agreement, when they felt the sellers had failed to live up to the agreement. The second paragraph of the document details the procedure to be followed:
“The aforementioned repairs and/or replacements are listed below and must be completed in a workmanlike fashion and accepted by owner, said acceptance not to be unreasonably withheld. If there be any disagreement as to the completion of said repairs, an inspector will be brought in to make a final inspection of said residence, said inspector is to be agreed upon by owner and other parties involved.”
No mutually agreeable outside inspector was called in. Odey Brown testified that after the due date had passed, he called on the agent holding the $7,000.00 escrow to request its release. When Hotard and Johnson refused to let the agent release the money, Brown then asked his attorney to write a demand letter. The petition and testimony indicate that where the Browns expected the entire $7,000.00 if any item was not performed by the due date, Hotard and Johnson believed that the money need not be forfeited if they had completed some or most of the work and had made an effort to do the rest. Plaintiffs’ own brief, while citing authorities for the principles of freedom to contract and a contract’s effectiveness as law between the parties, also cites authority for the judge’s right to interpret the contract, as stated in Bown v. Austral Oil Company, Incorporated, 322 So.2d 866 (La.App. 3d Cir.1975), at 870:
“The intention of the parties is of paramount importance and must be determined in accordance with the plain, ordinary and popular sense of the language used in the agreement and by giving consideration on a practical, reasonable and fair basis to the instrument in its entirety-
LSA-C.C. Article 1945 provides that agreements have the effect of law between the parties, who alone can abrogate or modify them, and that the courts are bound to give effect to all contracts according to the true intent of the parties when the language is clear and leads to no absurd consequences.”
An interpretation of the contract according to the Browns’ position could lead to the absurd consequence of a $7,000.00 forfeit for an uncompleted repair costing $50.00. The judge acted within his authority in refusing to award the $7,000.00 in liquidated damages and in attempting to determine the intent of the defendants by inquiring into the repair costs the escrow amount was to cover.
In considering the third issue, whether the court should have awarded the plaintiffs the amounts estimated by their experts, we must look to the requirements for an award of quanti minoris, the theory under which plaintiffs sued.
In an action for quanti minoris, where a defect is not sufficient to make an object useless to the purchaser, the rules and limitations for an action in redhibition apply. LSA-C.C. 2544. The buyer must prove the existence of the problem before the sale. LSA-C.C. 2530. The burden is on the buyer to prove not only the existence of the defect but the amount of reduction in price that is appropriate, and in the case of construction defects the cost to repair such defects. Palmer v. Asaff, 297 So.2d 487 (La.App. 2d Cir.1974); Johnson v. H.W. Parson Motors, Inc., 231 So.2d 73 (La.App. 1st Cir.1970); Hanna Investments, Inc. v. Stovall, 171 So.2d 678 (La.App. 2d Cir.1965).
The contract listed the following items as needing repair or replacement:
“1. Roof-repairs satisfactorily;
2. All thermal pane windows to be replaced;
3. Fill dirt-deliver upon roof completion, 6 yds.-l load;
4. House-paint outside, one coat;
5. Tile in utility room/kitchen-repair or replace;
6. Master bedroom tub to be repaired like new;
7. Master bathroom tub to be repaired like new;
8. Dishwasher defective or improperly installed;
*508 9. Counter top corner by oven unfinished.”
Plaintiffs’ petition added to the list leaking of the air-conditioning unit and improperly mounted sliding glass doors.
At the time of trial Mr. and Mrs. Brown testified that although several items had been repaired to their satisfaction, the following items had not: the roof, the thermal windows, the molding of the door frame, the air-conditioning system, and the sliding glass doors. The defendants, Hotard and Johnson, admitted that the windows had not been installed and the molding had not been placed on the door frame. As far as they were concerned, the roof and air-conditioner had been satisfactorily repaired.
We shall now discuss the five complaints in the order given above.
Roof. Concerning the roof defects, Sidney Campbell, a free-lance estimator who had previously owned a roofing company for thirty-five years, testified for the plaintiffs.' He inspected the Browns’ roof at their request in July, 1980, checking thoroughly both on the roof and in the attic, and later viewed the house from outside in November, 1981.
Campbell’s inspection revealed a number of defects which were causing leaks and deterioration and which he attributed to poor workmanship of the carpenters in installing the prefabricated components of the roof and cutting the parts that were made on the site. He found nail holes through shingles and sheathing, with water stains in the ceiling below them. The plumbing flanges and power vents had been installed after the roof shingles were in place instead of the reverse, resulting in inadequate seals. The shingles did not extend over fascia boards on the gables and the eaves, allowing water from the roof to go behind the fascia to the soffit. At valley lines the sheathing had been lapped instead of butted, allowing wind-driven rain to enter. Some of the metal valleys were cut too short, letting water into the soffit. Where sheathing dropped below the fascia line, the shingles sagged causing water to run into the fascia. In several places the sheathing was not attached to trusses, having been improperly nailed or having become delami-nated and pulled loose.
Campbell summarized his conclusions as follows:
“... any time water gets on untreated or unpainted lumber and it continually gets on it, plywood, fascia boards, sheathing, sheetrock or anything, it will deteriorate. .You have to protect it from the elements. And when the water gets in you have to stop it. That’s what roofing men and carpenters are all about.”
He testified that he could not be certain as to the cause of the delamination of the plywood sheathing; the usual cause is its getting wet. His recent view of the house indicated that the sheathing had continued to delaminate. Although he had prepared an estimate for merely repairing the roof in 1980, feeling that repair was feasible, he now felt that because of the condition of the sheathing, both the sheathing and roof would have to be replaced.
Dewey Johnson, the supervising contractor, testified that he inspected the roof in response to the Browns’ complaints of waviness and also had inspectors from U.S. Plywood, Kingsberry Homes, and independent inspectors check it. The experts found no structural damage and recommended correcting the waves and dips by raising the roof with bracing; however, the defendants did not file the inspectors’ reports into evidence. Johnson found no problem with the seals around plumbing flanges and power vents but admitted that his carpenters had repaired one gable where the shingles failed to extend over the fascia board and also had extended one valley over the fascia at the front door. He also found one place where sheathing was lapped rather than butted, which his men cut and repaired. He and Hotard engaged Roland Keating to do the bracing of the roof.
The defendants’ witness, Roland Keating, a building contractor with twenty-six years’ experience, testified in regard to his inspection of and repairs of the roof. The builders had sent him to check for “waves” in *509 the roof. He found a variation in the height of some of the rafters had caused a wavy effect and corrected the problem by raising or shortening the braces and adding some braces. He tested the rafters with a string before leaving the job and felt that he had corrected the problem. He did not recall seeing any rotted or water stained wood, shingles that failed to extend over the gable, or valleys that did not extend over the fascia, or sheathing that was lapped rather than butted. He stated that, “I was looking for the spots that were high and low that could be repaired so that they did not have to put a new roof on there and that was all I looked for.”
Thermal Windows. Dewey Johnson, one of the builders, testified that the windows were a new product and that the factory admitted the seals were bad and had shipped new windows to the site. Replacing the panes is a simple operation, but it cannot be done without the proper tool, a special wrench. Johnson stated that he had contacted Kingsberry Homes, which promised to send a representative of the window factory to replace them but had failed to do so.
Molding on Door Frame. Dewey Johnson testified that Keating was supposed to put the molding in place but did not. He admitted that the molding had still not been applied.
Air Conditioning System. In their petition, the plaintiffs allege that the central air conditioning unit leaked on the floor and carpet. The testimony from both sides is unclear. Mrs. Brown’s testimony indicates that there was a leak from the unit into the dining room shortly after they moved into the house, but that leak has been fixed. She believed that water was collecting within some tape placed on the unit by Mr. Hotard, but apparently no water was visible. Mr. Brown did not comment on a leak, but stated that the bedroom cooled no lower than 84°. Mrs. Brown quoted a Lennox representative as saying the unit should be replaced; however, no company representative was called to testify.
The plaintiffs’ witness, Kenneth Knob-loch, an air conditioning mechanic, inspected the unit in cool weather, a week before the trial. He did not run the unit and stated that, although there were signs of previous leaking, the unit was dry then. He could not determine the condition of the air conditioning coil without removing the unit from its closet, of which the door was narrower than the unit. He could not give an opinion on the poor cooling of the bedroom, as the plaintiffs had not asked him to investigate the problem.
Louis Hotard, a defendant, testified that he had cut into the coil of the air conditioning unit to correct a drip and assumed that the problem was corrected as he was not called back. The Browns did complain once that one bedroom was warmer than the rest of the house. He explained to them that the coolness would vary according to the distance from the unit, as the house was a long one.
As to cost of repairs, the plaintiffs apparently arrived at a figure of $14,359.54 by adding the totals of three estimates, as follows:
Sidney Campbell $3,461.00
Francis Plaideau (Jerry Brandin Construction Co., Inc.) 9,448.94
Kenneth Knobloch (HELP Air Condition & Heating Service Co.) 1,450.00
The Campbell bid was for replacement of the roof, not including sheathing replacement which he felt to be mandatory. Campbell explained the items involved in detail in his testimony.
Francis Plaideau’s bid included removing and replacing all roof sheathing, rotten fascia and soffit; removing and replacing two laundry doors; removing and installing new sliding glass doors and all windows (doors and windows to be supplied by the owners); washing down house; removing and replacing all caulking; and repainting the exteri- or of the house. The laundry doors and painting the exterior clearly were not necessary repairs claimed in this suit and must be ignored. Being unfamiliar with the installation of thermal windows, Plaideau be *510 lieved that the masonry around the windows had to be removed, the frames and sashes removed and replaced, and the openings rebricked. His bid was based on his belief and amounts of $1,835.00 for carpentry and masonry to install the windows and sliding doors.
Dewey Johnson estimated that a man who had the expertise could replace the windows in eight hours at $25 to $30 per hour, or at most $240. We accept Johnson’s estimate as reasonable and discard the estimate of Plaideau. As a separate estimate was not provided for reinstallation of the sliding doors, we have no proof as to costs of repair.
The portion of Plaideau’s estimate that covered roof bracing and replacing sheathing, fascia, and soffit assumed that no wood could be salvaged. Labor and materials amounted to $3,524.00, which with an override of 25% gave a total price of $4,405.00.
The Knobloch bid was for replacement of the air conditioning coil. His letter explaining that he could not service it without removing a wall and his testimony both indicate that he did not know whether or not replacement or repair was needed. He made no examination of the system as to the under-cooled bedroom, hence no estimate of cost of repairs is in the record.
No estimate was made of the cost of applying the missing molding to the bathroom door frame; however, the defendant’s attorney suggested $50 as a fair price and Mrs. Brown agreed.
We find that the plaintiffs have carried their burden of proof as to the existence of and cost of repair of the roof defects and resulting rotting of soffit, the uninstalled replacements for defective thermal windows, and the missing molding for the door frame; therefore, they are entitled to a reduction of the purchase price of their residence.
The cost of repairs is allowed as follows:
Replacement of roof $3,461.00
Replacement of sheathing and soffit 4,405.00
Installation of thermal windows 240.00
Application of molding to door frame 50.00
Total $8,156.00
Accordingly, we reverse the trial court’s judgment dismissing plaintiffs’ suit and enter judgment in favor of plaintiffs. We award a reduction of purchase price in the amount of $8,156.00 plus legal interest from date of judgment and all costs of the proceedings.
REVERSED.